We're here today for oral arguments. We're going to begin with appeal number 23-2644, Michael Bost et al. v. Illinois State Board of Elections et al., and we'll begin with oral argument from Mr. Nobile. Thank you, your honors. May it please the court. Russell Nobile on behalf of all plaintiffs. The primary question before the court today is whether federal candidates have standing to sue over time regulations governing their federal elections. Every non-vacated circuit ruling on this question has found that they do. In fact, we've been unable to find any Supreme Court precedent in which a federal candidate was found to not have standing to sue over time, place, and manner regulation related to his or her federal election. We ask that the court reverse the trial court's 12B1 ruling with respect to standing. We believe that the candidate standing injury is the sword that cuts this Gordian knot. To illustrate this injury, I note that Illinois held its federal primary nine days ago. While the federal election day statutes do not apply to federal primaries, Illinois' 14-day receipt deadline does, and so we can illustrate the injuries that my client, Congressman Bost, is suffering. Right now, he's ahead in the count. He has spent nine days monitoring late-arriving ballots, calling districts, checking the Internet, having his staff do it, to make sure that the victory that is believed that he received on election night is not taken away by late-arriving ballots. So, Mr. Noble, with regard to Mr. Bost's claim of injury, looking at the publicly available documents on the State of Illinois website, it appears that in 2022, he got 75% of the votes. That is, he received 218,000 votes. His opponent received 72,000 votes. So, Mr. Bost, to his credit, won by a wide margin. Is there anything to think that had whatever votes arrived at the precinct offices or for counting after election day would have had any impact on that outcome? That is, would have made Mr. Bost's candidacy in 2022 unsuccessful versus the 75% that he received? I believe Your Honor is asking about should he have alleged a risk to his electoral prospects, or is this— That's not what I'm asking. What I'm asking is, is there anything that would indicate on the record that would have made any difference at all to Mr. Bost, whether or not those votes that arrived after election day were counted? Well, that was for 2022, of course. He's running six—or excuse me, eight years before. So, it wasn't the only election. We filed, of course— Okay. In 2020, then, he won—he got 60.43% of the vote. And so, he won by a nearly 70,000-vote margin. Is there anything to indicate in 2020 that counting the votes that arrived at the election officials' offices would have made any difference in the outcome of that election? So, had he lost every single vote and had gone the other way in 2020 for Mr. Lindsey, in 2022 for Mr. Markle, he still would have won. Is there anything to indicate that he wouldn't have? Well, after the fact, no, Your Honor. But before it, he has to make a decision because he doesn't know the electoral outcome. Congressman Bost is a 30-year veteran of elected offices. The court is—if I understand the court's question properly, the court is saying, was it reasonable to exercise his discretion in covering the post-election canvassing? And we believe, at this stage in the proceedings, that should be—well, first off, he's an expert on running elections nationally. Thirty years he's been elected office. Secondly— Is there a line of that reasonableness? So, what if at the end of Election Day, before any additional other votes were counted, he had received 99% of the votes that were counted at the time, and his opponent had received one? Is there any—would it still—taking your test, which—and I'm not sure whether that is the right test—would it still have been reasonable for him to spend any more money to oversee whatever counting took place after Election Day? We believe, to the extent that is a concern for the court, that is a question of fact, that at this stage in the proceedings should be resolved. But isn't it a question of standing? That is, whether or not he would have received any injury at all, whether or not currently the injuries he alleged are hypothetical and speculative in nature? Because who knows? At the end of the whole process, maybe he would have won, and maybe he would win by a large margin. Well, he can't know that until after the fact. But we believe that— But isn't that the point, though, that no one can know that? And so that's why it's speculative.  But I would submit that a lot of that goes to traceability in understanding of, like, is it reasonable to exercise his discretion to do these certain things to ensure his electoral victory, if I understand the court's question properly? And we believe that was largely part of or analogous to the situation in Ted Cruz for Senate. Senator Cruz had to take out a loan of $250,000, and there were certain FEC regulations that were triggered as a result of that. Senator Cruz did not have to spend $250,000. He won his election over at that time. He could have saved $250,000 and didn't spend it on marketing or get out the vote or campaign infrastructure or whatever. And the Supreme Court said there, that goes to traceability. And the Supreme Court said, even if it's willingly incurred—even if they knowingly triggered the injury, and it doesn't matter if it's willingly incurred, it's fairly traceable to the regulation. I think I understand the court's question about, is it such fait accompli that he would win anyway? But that puts courts in the uncomfortable position of trying to read polling data pre-election to figure out if this gentleman's going to win or if that gentleman's—general lady's going to win the election. I don't—we have not found that Article III standing is contingent on that. There's certainly no case law that you need to—I mean, I understand the court's—I believe the court's question is slightly different in that it was a fait accompli versus did he need to allege— But I will note that in 2020, the state issued press releases saying, don't trust—and I'm paraphrasing, of course, but don't trust the election night results. Electoral victories on election night may change after late arriving ballots come in. He has no idea of knowing that will happen until well after they find out how many votes come in. I understand the court's hypothetical. They're saying 99 percent. Respectfully, that hasn't happened here. I don't know the exact numbers of whether or not it's fatal on the front end, but he was warned by them. He's alleged that in the complaint. He has no—he and the other plaintiffs have no idea what will happen after election night, especially given that the state officials have warned him that it may change. Mr. Nobel, can I pivot you to the merits real quick? Yes, Your Honor. Mindful you want to reserve some time for rebuttal. On the merits question, what do you make of the fact that it seems like over about the last 150 years or so, since the U.S. Congress enacted the two statutory provisions implementing the Elections Clause, that Congress has really never chosen to address any kind of ballot receipt deadlines despite amending those statutes many times? And then in more recent history, you have—you know what the acronyms are. You have those military service member statutes. What do you make of that history on the merits question? A couple points, Your Honor. First off, I would point out it's just really impossible to get election statutory stuff through Congress. And so the failure to act on it, you know, may reflect different issues going on at the time. And obviously there's—you know, it's seen as a very controversial issue. So it's tough to find probably a compromise without a supermajority. But with respect to the court's question, there have not—this argument there's longstanding congressional tolerance for this. That's just not 100 percent accurate, if accurate at all. Congress has not passed anything, admittedly. But post-election receipt for the time period Your Honor pointed out was experimented with a couple times, as we pointed out to the lower court in our brief here, but largely abandoned, except for the state of Washington. California did it briefly in 1933. They abandoned it until 2015. It seems odd, though, in the military statutes that Congress would respect—acknowledge and respect the fact that some states have receipt deadlines that post-state election date, and that in the text of the federal statutes Congress would, you know, allow those to be respected if at the same time all of the state law was, you know, categorically preempted. It's just an odd conclusion. And I would point out in 1972, I believe it was 1972, in the 70s, when they first came up with the predecessor to UOCAVA, they talked about expanding the receipt deadline, and they declined to do that. So Congress did consider it and declined to do it. Now, the question is, does that favor for us or against us? That's obviously a difficult question. I would point out— In this MOVE statute, though, that acronym, whatever it is, M-O-M-V-E, they've adopted the state deadlines, right? So long as the receipt complies with state law. With respect, the concern about military ballots is obviously a ballot concern, and everyone takes that seriously. We would not have brought this case if we thought there was a serious risk. I can emphatically say that the UOCAVA issues raised by some of my colleagues are straw men. And I can say this confidently because I have enforced UOCAVA for 20 years. In a prior life, I did it on behalf of the United States. The way UOCAVA works is—well, the way UOCAVA worked before the MOVE Act is all states need to send out ballots within a reasonable time before elections. And then if you recall in 2008, there was a great deal of controversy about late going out ballots during the McCain and Obama election. After that, at the department, there was a big struggle to figure out what is reasonable. Is it 45 days in California? Is it 60 days in Illinois? And what Congress settled on is that if you requested it timely, you have to send ballots out 45 days ahead of time. And so with the MOVE Act, that's largely what it did. And then it provided some alternatives where there's a violation, the ballots don't go out. But with respect here, the MOVE Act mainly just set a firm deadline as to what was reasonable under UOCAVA. I thought the statutes also addressed—and I may be mistaken on this, you can correct me. I thought they addressed receipt in some ways, not so much the sending on the front end, but when they have to be returned, in other words. They deal with receipt in other respects. If there's a violation, there's all sorts of mitigation tools that states and the Pentagon can implement to help. There's like the federal mail-in ballot that people can write on. But with respect to changing the receipt day, it made no changes to the receipt day. It mainly says for UOCAVA purposes that ballots need to go out 45 days. If they're asked in time, they need to go out 45 days before the election. And that's why when there is a UOCAVA violation, it is a fairly straightforward statute. And I will point out that the case that the United States relies on primarily and the first case applying the MOVE Act was my last case at the Department, United States versus Alabama. And in that case, Alabama failed to—several counties in Alabama failed to send out a timely ballot. We sued. We got a ballot extension. And then they got the time adequately—the time provided. So to reserve the remainder of your time?  Could I ask one question? Sure, absolutely. I still have five minutes, correct? You have two minutes left. Of the ten minutes or the five minutes? You have two minutes left. Of the ten minutes? Oh. I reserved the balance of my time. If I could just ask a question. Under your theory that all votes need to be cast and received by Election Day, would that—so at least 21 states have cure provisions, ballot cure provisions, right, where a voter can submit an absentee ballot and, let's say, the signature is in the wrong place or what have you. And at least 21 states allow that curing to take place after Election Day. Under your theory, would all of those statutes also be preempted? No, Your Honor. That's just like the provisional ballot provision. If the ballot's received beforehand, just like in Section 302 of HAVA, which Congress reinforced the importance of Election Day with 302, if the ballot's received by Election Day, that back-end question about eligibility and all that can be resolved. And so we think our theory is perfectly consistent with that. Thank you. I'll remain in reserve. Thank you. Thank you, Mr. Nobile. We'll now move to Mr. Hammer. Good morning. Deputy Solicitor General Alex Hammer for the State Board of Elections. I'm going to begin where the Court left off with Plaintiff's Counsel with the merits, but I want to make sure to keep a couple minutes of time for standing at the end. So Plaintiff's primary claim here is that the Illinois statute setting a 14-day deadline for mail-in ballots is preempted by the federal Election Day statutes. That argument is not supported by text, precedent, or history, as the District Court correctly held. I want to start with the text of the federal Election Day statutes, which I think is essentially dispositive here. The text of the statute providing for the election of congressional representatives makes the first Tuesday in November, quote, the day for the election. And the text of the statute providing for the appointment of electors provides that that appointment shall occur on Election Day. Nothing about the text of either statute limits a state's ability to count mail-in ballots that are cast on or before Election Day but are received after it. And indeed, over half the states count such ballots under at least some circumstances. No court has ever held, or even so much as hinted, that federal law prohibits those states from making that choice. Plaintiffs offer almost no textual counterargument, no reading of the text of the federal statutes that would give rise to such a rule. Instead, their argument seems to depend on essentially two sources, dicta from the Supreme Court's opinion in Foster v. Love and a kind of opportunistic reading of the historical record. But the state's choice is consistent with both Foster and history. First, nothing in Foster supports plaintiffs' reading of the federal Election Day statutes. Foster concerned a Louisiana law that, in practice, provided for the election of federal officials in October with no election at all occurring on Election Day for something like 80% of federal offices. And the court held that that law was preempted by the federal Election Day statutes. But it took extraordinary pains to emphasize the narrowness of its opinion. It described the case as a narrow one, and it emphasized that states could still allow early voting as long as the polls remained open on federal Election Day. Foster says nothing at all about mail-in voting and says nothing at all about the counting of ballots after Election Day. And no court has ever read Foster to speak to those issues. Plaintiffs' counterargument depends almost entirely on the court's use of the phrase final act of selection in one passage. And I think it's useful to kind of think about this argument in two parts. Plaintiffs are saying, first, there must be some final act of selection that has to occur on Election Day and not after. That's the holding of Foster in their view. And second, they say that final act has to be receipt. That is, a state has to receive all ballots by Election Day and not after. And I think both parts of that argument are wrong. You know, first, as we explain in the brief, Foster does not use the phrase final act of selection in the way that plaintiffs mean. Foster uses the phrase final act of selection as a kind of outer limit on what states that are conducting early voting have to do. They say if you want to have an early voting system, you still have to have something happen on Election Day. In the court's words, some act in law or fact. So plaintiffs' reliance on that phrase to set kind of a limit on the state's ability to count votes after Election Day puts far more weight on it than it can bear. But even if you do read Foster to suggest that there has to be some sort of final act in law or fact that occurs on Election Day and not after, Illinois statutory scheme complies with that rule. Illinois law sets a final deadline on Election Day for the most important act of all, the casting of a voter's ballot. The statutory scheme plaintiff's challenge requires voters to certify and transmit their ballots on or before Election Day in order for those ballots to count. So even if Foster does require some final act of selection to occur on Election Day and not after, the ballot deadline statute complies with that rule. Now again, plaintiff's position is that not only must there be some final act of selection that occurs on Election Day, that final act must be a state's receipt of ballots. That is a highly gerrymandered rule, one that finds no support in Foster or the text of the Election Day statutes, as I think plaintiffs all but concede. Instead, their claim rests on what they call the original public meaning of the federal Election Day statutes. They say that those statutes would have been understood when they were enacted to require the receipt of all ballots by Election Day. But the historical record does not support this argument at all. If anything, it tends to refute it. Plaintiffs point to nothing in the legislative history of the federal Election Day statutes that supports that reading, no contemporaneous statements from legislatures. And as we discussed in the brief, the most important historical evidence, the evidence of states' practices around the Civil War era, which occurred contemporaneously with the enactment of the Election Day statutes, supports our view, not theirs. In the first widespread use of absentee voting, most states allowed soldiers who were off fighting the war to cast votes remotely rather than in person. And although most states provided that those votes would be cast on Election Day, they also permitted, often expressly, those votes to be sent back to state and local officials and received days or weeks after Election Day, just as in Illinois. Mr. Hammer, do you want to say a word about standing? Because I've got a question after that for you. I just want to be mindful of the time. I'd be happy to, Judge Skudder. So the district court's decision can also be affirmed on the ground that plaintiffs lack standing to challenge the 14-day deadline. Plaintiffs assert standing to challenge the deadline statutes as voters and political candidates. But voters aren't injured by a law that makes it easier for other voters to cast ballots. And plaintiffs haven't alleged injuries sufficient to give rise to Article III standing as candidates for public office. I'll sort of skip the voter piece because I know Mr. Nobile was focusing primarily on the kind of candidate standing argument. You know, I guess I want to start here by pointing out what plaintiffs aren't alleging, or at least what I don't read them to allege. Plaintiffs aren't alleging the kind of injury that this court recognized as sufficient in the Trump case. And that's a kind of competitive injury, one in which a candidate argues that a state law will make it harder for him or her to get elected. Plaintiffs didn't allege that in the complaint. And although we pointed this out in the answering brief, they didn't argue in the reply that we had misread the complaint. So I think that's not what they're arguing. I think they're arguing two things. First, that they're entitled to a kind of accurate vote count in the abstract. And second, that the deadline forces them to expend campaign resources monitoring mail-in ballots. The first injury is just a kind of candidate-specific way of saying that one is entitled to have the government act in accordance with the law. That's not a concrete, particularized injury. That leaves plaintiffs' argument that the deadline affects them because it requires them to kind of monitor mail-in ballots for the two weeks after Election Day. But this is a kind of classic self-inflicted injury, as I think some of Judge Lee's questions were kind of getting at. Nothing requires plaintiffs to incur these costs. And under Clapper, a plaintiff can't secure standing simply by making an expenditure to avoid some sort of harm that isn't certainly impending or that isn't traceable to the challenge conduct. That's exactly what's happening here. As we discussed, plaintiffs don't allege that the 14-day deadline actually harms them as candidates in a kind of competitive sense. The votes that are received after Election Day aren't harming them in a concrete way. So they're essentially in the same position as the plaintiffs in Clapper. They're not spending money to avoid some sort of harm traceable to the deadline. They're just spending money. Can I get the benefit of your reaction to the – I'm going to pivot you a minute. Okay. But I think you can help on this front. Now, Mr. Nobil, you may be able to weigh in on it, too. Assume we disagree with you on standing and assume we go to the merits, okay, and assume we agree with you on the merits. What about the failure to file a cross-appeal vis-à-vis appellate jurisdiction? Sure. So, I mean, Judge Scudder, I have not found a single case in which this court has required a cross-appeal where the district court – Fair enough. Okay. I think it's a hard question. I think it's a hard issue, and the reason is because I think you'd have to acknowledge that the judgment would be enlarged. It'd be enlarged because it'd go from without prejudice to with prejudice. I guess my response, Judge Scudder, is that would put district courts in a very difficult position because district courts do what the district court did here all the time. They reach both standing and the merits, and there has to be kind of a bottom line in that opinion, and I think Judge Ness did the right thing here in saying, well, because I agree with the state both on standing as well as the merits, I'm going to make the dismissal without prejudice. Okay. Okay. Fair enough. That's fair. Okay. Here's my question. The requirement to file a cross-appeal jurisdictional, as we use that term, post-Steele Company? I don't think so, Judge Scudder, and we're happy to write a supplemental letter on this. Obviously, this came up only in the reply, but the court has kind of been careful not to kind of make a pronouncement about that, and, in fact, there are cases in which it has said, you know, we could relax the cross-appeal requirement if there's no prejudice to either party, and there's clearly no prejudice here. I mean, plaintiffs haven't actually argued that the merits aren't properly before the court, or at least I don't understand them to argue that, which is the position they would have to take if they thought that a cross-appeal was lacking. You know, they've argued the merits in the briefs. Everyone has had the position to brief it, and so, you know, I think under these circumstances, again, we can file something supplemental if the court desires, but, you know, the court could easily kind of say, you know, any failure to file a cross-appeal here is not prejudicial, and so we kind of relax the requirement. But I guess I would urge the court, and I know I'm out of time, not to make that ruling at all because I do think it would be, you know, highly kind of disadvantageous to district courts who, you know, do things like this all the time. Thank you, Mr. Hammer. Of course. Mr. Bocat, we'll move to you. Good morning. May it please the court, Noah Bocat-Lindell for the United States. It is the United States' position that Illinois' ballot receipt deadline fully complies with the federal Election Day statutes. If I can, I'd like to start with some of the questions that Judge Scudder was asking about congressional tolerance or ratification as well as, hopefully, responding to some of the questions that Judge Lee had asked about cure provisions and what the logic of the plaintiff's position here would be on the merits. So, Judge Scudder, you are absolutely correct that Congress has continued not just to tolerate but to actually use states' various ballot receipt deadlines throughout history and that those do not in any way conflict with the federal Election Day statutes. UOCAVA says that military and overseas voters can use a federal absentee ballot if they don't receive their state absentee ballot in time but determines that that federal absentee ballot won't be counted if the state absentee ballot gets back to the state in time for the state's ballot receipt deadline. That's in the text of the statute, right? That's in the text of the statute, yes. And then the MOVE Act requires the presidential, the designee of the state, usually the state secretary of state, to facilitate the delivery of ballots back to local election officials by whatever the state's ballot receipt deadline is. It does not say by federal Election Day. It doesn't cross-reference the federal Election Day statutes. It says by the day that the state requires ballots to be received. So those statutes, as well as Section 202 of the Voting Rights Act from 1970, which required all presidential absentee ballots, it required states to accept absentee ballots in presidential elections up until the closing of polls but expressly said that states may have less restrictive practices than what the statute required them to have. And I think that that requirement versus allowance distinction gets at some of the points that Plaintiffs' Council has been making here. Just because Congress decided in the predecessor to UOCAVA not to require every state to have a post-Election Day ballot receipt deadline for military and overseas voters does not in any way change the fact that states are allowed to have those deadlines. And not only do 18 states, the District of Columbia, and the majority of U.S. territories have general post-Election Day ballot receipt deadlines for everybody, but 11 other states, the 10 in footnote 2 of Illinois' brief plus North Carolina, all have separate ballot receipt deadlines post-Election Day for military and overseas voters. And that is very important to the United States' ability to enforce UOCAVA because those laws all provide a cushion on the back end. If states violate their obligations under UOCAVA and the MOVE Act to send out their ballots by the 45-day deadline, it gives a cushion to ensure that those ballots will still arrive back. And if states don't have those post-Election Day ballot receipt deadlines, then it requires the United States to go to court and engage in unnecessary use of judicial resources if these statutes were to go away to try to make the state extend its ballot receipt deadline past Election Day to make up for the fact that they sent out the ballots late under UOCAVA. The broader point you're making, though, is that I think, tell me if I'm wrong, is that it seems very odd for the same Congress, the United States Congress, to do that in a way that would be at odds with the election statutes, right? To allow that in the overseas voter, you know, enlisted service member context and somehow obliquely or indirectly, like, modify, amend, change, you know, the provisions in Title II and Title III. That's absolutely right, Your Honor, and there's nothing about that. It sheds some light on what Congress, the same Congress that enacted the earlier ones, thought about the meaning of Election Day. Yes, that's right, Your Honor, and there's nothing about the logic of the plaintiff's position that would distinguish between the general ballot receipt deadline statutes and the UOCAVA-specific ballot receipt deadline statutes. The same logic would apply to both of them, and yet Congress has clearly allowed states to have their own separate ballot receipt deadlines. The logic of their position also would not distinguish as to why receipt of the ballots is the proper stopping point for determining when the final selection has been made as opposed to verifying that those ballots were validly cast, as Judge Lee was pointing out, as HABA requires, or that the ballots are counted. The Sixth Circuit in Millsap makes that exact point when plaintiffs were making this argument on the other side of Election Day, saying there's really no non-arbitrary distinction between receipt of the ballots and these other actions that have to be taken. I see that my time is up. Thank you, Mr. Bocat. Thank you. Mr. Nobile, we'll bring you back. We'll give you four minutes for rebuttal. Thank you, Your Honor. You're welcome. If I may first try to summarize the merits of the case here, Your Honor, and we should have made this a little bit more clear in our brief, and so I'll take an opportunity to do that now. Illinois cannot extend receipt day for the same reason that Arizona can't add an informational requirement to the federal form. In intertribal, the Supreme Court said that when a... Let me just back up here. Receipt day in Illinois is a timing regulation. Election day is a timing regulation. And so in intertribal, the court has to, according to intertribal, the court has to read those together. And in intertribal, the Supreme Court, by Justice Scalia, said when the federal government regulates something, it necessarily, in the elections clause context, it necessarily displaces state authority to do something else. And so the question really before this court is what did Congress displace when it enacted the election day statutes? And we're not sure. Well, it's not clear, but our view is the parameters of what was displaced was set forth in Foster. It was the combined actions of voters and election officials to make the final act of selection. The question is what are the boundaries of that? Where does the four corners of that displacement begin? And we submit to the court that is read from the original public meeting, from Foster v. Lobb's interpretation, and 3 U.S.C. 21, which was enacted during dependency of this litigation. Now, I would also add that my colleague on the other side talked about all this cushion that Congress would be surprised that they lost. It's important to note that these cushions, for the most part, came up after the MOVE Act. So Congress had no idea there was a cushion when it enacted the MOVE Act. Most of these post-election receipt deadlines were enacted after 2004, and really after 2010. Illinois is the exception, but most of these statutes, this trend is a new trend, and that's why the court's facing it now. Also, the number of absentee ballots have gone up dramatically, 46% in 2020 versus 0.5% in 1933. It wasn't material then. Nobody cared. It didn't change the outcome of elections. We have state officials in Illinois saying it's going to change the outcome of the election now. These are material questions. And so that's why this court is faced with that question at this point. Now, this concept of congressional long tolerance or the long tolerance, I went back and looked at Foster v. Love in prepping for this, and I note that Louisiana statute had been in place longer than Illinois statute in question here. So if there is a long tolerance, the Supreme Court and Congress didn't care about it when it issued in Foster. So this statute is actually younger, a younger version of a statute in question. And I would also note that Congress and the Supreme Court tolerated malapportionment for 90 years before it finally introduced the one-person, one-vote concept. And so we acknowledge there's been some tolerance, but it's not as meaningful as it seems, especially when you realize that the trend is a recent trend largely predicated on the advent of HAVA, and HAVA drove home the point in Section 302 of HAVA that when a voter shows up in the poll and there's some dispute about whether or not that individual can vote, they don't go home. They cast their vote. It's received. It's secured. And then a week or two later, they get to figure out whatever the problems are. And that's an elegant way to solve a controversial problem in 2020 so that voters aren't disenfranchised because there's some quirk in the registration record or people got in line too late. Get their votes in. We'll sort that out on the back end. But Congress emphasized receipt at that point. And so, you know, I think that highlights it, but for the same reason why Arizona can't supplement the voter registration form, Illinois can extend receipt deadline and modify that area of space that Congress necessarily displaced under intertribal. Thank you, Mr. Nobile. Thank you, Mr. Hemmer. Thank you, Mr. Bokad. With that, the case will be taken under advisement.